IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01959

ANNETTE NICK,

    Plaintiff,

v.

OFFICE DEPOT, INC., a Delaware Corporation,

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Annette Nick for her Complaint states:

### INTRODUCTION

1. This is an employment discrimination suit brought by a former employee of Office Depot, Inc. ("Office Depot") who was discriminated against based on her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. ("Title VII"), including being terminated after over 30 years of employment. Plaintiff further asserts a state law breach of contract claim against Office Depot based on the company's failure to follow its own mandatory progressive discipline and termination policies and procedures.

## PARTIES

2. At all relevant times, Plaintiff Annette Nick was a resident of the State of Colorado.

3. Office Depot is a Delaware corporation authorized to do business in Colorado and maintains a registered agent in Centennial, Colorado.

4. Office Depot's principal office is located at 6600 North Military Trail in Boca Raton, Florida 33496.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), in that this action arises under federal law, specifically Title VII. The Court has supplemental jurisdiction over Plaintiff's state contract law claim pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as the unlawful employment practices alleged herein were committed within this judicial district.

7. At all relevant times, Office Depot was covered by the definition of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

8. The procedural prerequisites for the filing of this suit have been met: Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue.

## SPECIFIC ALLEGATIONS

9. Plaintiff is a woman.

10. Plaintiff began working at Office Depot and its predecessors in 1986 as a Sales Representative with Wassertrom Office Products.

11. She remained with the company when it was subsequently purchased by Boise Cascade, OfficeMax, and then Office Depot.

12. Throughout her employment at Office Depot, Plaintiff's performance was satisfactory or better and she steadily rose through the company's hierarchy.

13. Plaintiff was promoted to Sales Manager in Columbus, Ohio, General Manager I in Oklahoma City in 2002, and General Manager II ("GM") of the Distribution Center ("DC") in St. Louis in 2005.

14. In 2006, Office Depot asked Plaintiff to move to Colorado to manage the DC operations in Denver.

15. When Plaintiff began as the GM in Denver, the Denver DC was one of the lowest performing in the country; within six to twelve months under Plaintiff's leadership, the DC improved significantly and was meeting or exceeding many of its goals.

16. Around 2012, Office Depot had Plaintiff take on the additional responsibility of the DC operations in Salt Lake City.

17. After Office Depot purchased OfficeMax, Plaintiff was asked to manage another DC in Denver, and ran all three of these facilities–two in Denver and one in Salt Lake City–until the Salt Lake City DC closed in 2015.

18. During her time as GM of the Denver DC, Plaintiff consistently received positive feedback from the company's leadership team, including her most recent supervisor, Regional Senior Director of Supply Chain, Danny Chavarria, and her previous supervisor and Mr. Chavarria's predecessor, Cheri Janetzke.

19. By 2017, Plaintiff supervised upwards of 170 employees and, under her leadership, the Denver DC generated approximately $350 million in sales and consistently met or exceeded its goals.

20. Following Office Depot's purchase of OfficeMax, Plaintiff was also responsible for successfully overseeing the consolidation of the inventory of both companies in Denver–internally referred to as the "Sunrise Project"–which was a highly complex endeavor requiring extensive oversight, leadership, and long hours.

21. Despite Office Depot's own acquisition plans, which included a specific timeline for the Sunrise Project intended to limit the interruption of key peak seasons like back-to-school from July through September, Tim Beauchamp, a Senior Vice President, demanded that Plaintiff's DC begin this consolidation five months ahead of schedule in August.

22. Despite the complexity of the Sunrise Project and its occurrence during such a crucial business time, Plaintiff completed the Sunrise Project by February 2017 without issue following months of 12- to 16-hour work days by her and her team.

23. During that time, Plaintiff also hired and trained 80 additional associates, added 32 OfficeMax retail stores, and implemented the sortation and segmentation process for 76 retail stores at the Denver Annex, all while navigating the 2016 back-to-school season.

24. Despite Plaintiff's long and successful tenure with Office Depot, the company began to subject her to rigorous, unfair scrutiny in an effort to force her out of the company.

25. This campaign to push Plaintiff out of the company began in early 2017 when Plaintiff was the only female GM out of Office Depot's 19 DCs in the country.

26. Around April 2017, Senior Vice President Rick DiMaio required that Plaintiff attend biweekly calls with him, which he reserved for the lowest performing DCs in the country.

27. Plaintiff's participation in this regular call was unnecessary given the superior performance of the Denver DC in comparison to the other DCs on the call.

28. Participating in the call also required considerable extra work, i.e., at least six hours for Plaintiff to compile necessary information in advance of each call.

29. When Plaintiff asked her supervisor, Mr. Chavarria, why she had to attend these calls, Mr. Chavarria could not provide a reason other than that it was Mr. DiMaio's preference.

30. Mr. Chavarria never led Plaintiff to believe that her job was in jeopardy; instead, he assured her that she would only have to attend the calls for another month or so because her DC was not underperforming.

31. During these calls, Mr. DiMaio often treated Plaintiff in a demeaning and belittling manner.

32. For example, Mr. DiMaio repeatedly berated Plaintiff for allegedly failing to schedule on-time appointments for inbound receiving during the 2017 back-to-school season, even though Plaintiff told Mr. DiMaio that her DC scheduled such appointments whenever they were requested, and the receiving department was even taking appointments ahead of time.

33. Mr. DiMaio did not stop accusing Plaintiff of this until Mr. Chavarria told him that he had personally visited the Denver facility and audited the appointments himself.

34. On at least one occasion, via an e-mail on which he copied 19 other people, Mr. DiMaio erroneously accused Plaintiff's DC of failing to comply with a certain requirement.

35. Plaintiff never observed Mr. DiMaio treat her male GM colleagues in this same fashion.

5

36. Office Depot continued its efforts to force Plaintiff out of the company with a visit from Vice President Bob Miller to Plaintiff's DC on or around July 26, 2017 to conduct an audit.

37. During Mr. Miller's audit, he chastised Plaintiff because her warehouses were allegedly not clean enough "to eat off of" despite the fact that Plaintiff and her team had been working upwards of 12 to 16 hours every day to resolve an inbound freight processing backlog caused by Denver DC's receipt of an overwhelming amount of product during July 2017 in preparation for the back-to-school season.

38. Plaintiff and her team miraculously resolved the backlog by August 1 but did not have time to have the floors clean enough "to eat off of" as Mr. Miller demanded during his audit.

39. To Plaintiff's knowledge, male GMs with DCs that did not meet this standard were not disciplined or otherwise chastised as a result.

40. During his audit, Mr. Miller also told Plaintiff that Denver was "the worst performing location" and had been for "a long time," both of which were false.

41. Although several members of Office Depot's management, including Mr. Chavarria and the Vice President of HR, acknowledged that Mr. Miller's behavior during his Denver visit was abhorrent, nothing was done regarding the deeply flawed and inaccurate report that Mr. Miller generated after his visit; in fact, Office Depot promoted Mr. Miller the following week.

42. On August 7, 2017, Office Depot sent a trainer from the Dallas DC, Christy Wallmueller, and an Inventory Control Manager to Plaintiff's DC to conduct additional audits.

43. During Ms. Wallmueller's audit, she assured Plaintiff that the Denver DC was in excellent shape and that the results of her audit would be positive.

6

44. In comparison, Ms. Wallmueller said that she had been to the Cincinnati DC the week before and it was very behind in receiving.

45. Plaintiff later learned that a similar audit of the Bristol DC that occurred around the same time was far inferior to the audit of Plaintiff's DC.

46. The GMs of the Cincinnati and Bristol DCs were both male.

47. The next week on August 15, an Office Depot Loss Prevention Manager, Jeff Riggs, arrived at Plaintiff's DC to conduct yet another audit, even though this Loss Prevention audit was not scheduled until the third or fourth week of September.

48. Regardless, Mr. Riggs commented that Plaintiff's warehouse looked excellent and specifically complimented Plaintiff on her commitment to complying with Office Depot's dock safety standard operating procedures.

49. Mr. Riggs ultimately produced and provided a positive audit of the Denver DC to Mr. Chavarria and other members of Office Depot's upper management.

50. Despite the recent positive audits and the continued strong performance of the Denver DC under Plaintiff's leadership, Office Depot terminated Plaintiff on August 30, 2017.

51. When Plaintiff expressed shock and concern that she was being terminated even though she had received no prior notice of any performance issues, Mr. Chavarria responded only that there had been "a lot of conversations" regarding Plaintiff "with senior level management over the last 30 days" and the decision had been made to "release [Plaintiff] from the company."

52. Later that day, Mr. Chavarria announced to the entire staff of the Denver DC at an "all-hands" meeting that Office Depot "decided to terminate [Plaintiff] today."

53. Terminating Plaintiff without providing her with any formal notice of her alleged performance issues violated Office Depot's established policies and policies, which mandated that management-level employees be placed on a performance improvement plan before they could be terminated.

54. During Plaintiff's time as a GM at Office Depot, managers were required to first consult with the company's Human Resources Department before they could discipline a management/exempt-level employee like a GM.

55. After this consultation, managers would place management/exempt-level employees on Performance Improvement Plans ("PIPs") for a minimum of 30 days, during which time the managers were required to meet with their subordinates regularly to gauge their improvement.

56. Barring egregious conduct by the individual on the PIP, management/exempt-level employees could only be terminated after the conclusion of the PIP and with the approval of the HR Department and, often times, the additional approval of Office Depot's Legal Department.

57. Plaintiff is unaware of a single other instance when Office Depot terminated a management/exempt-level employee without first placing him or her on a PIP for a minimum of 30 days.

58. While Office Depot fired Plaintiff without any documentation of alleged performance issues, let alone a PIP, it failed to promptly discipline or terminate a number of underperforming male GMs, including the GMs of the DCs in Kansas City, Bristol, and Atlanta.

59. Office Depot also placed the Newville DC's GM, who led an underperforming DC from at least the summer of 2014 through the beginning of 2017, on a PIP and later gave him the

option to resign with 30 days' notice rather than be terminated and also provided him with severance pay after his termination.

60. In addition, Office Depot paid the male GM of the Columbus DC, who was fired for cause just a month after Plaintiff, a bonus in early 2018 for the performance of his DC in 2017.

61. The company paid Ms. Nick neither a severance nor any portion of her 2017 bonus despite her DC's excellent performance that year under her leadership.

62. After Plaintiff was terminated, her former Operations Manager, AJ Keeley, told Mr. Chavarria that she was interested in applying for the open Denver DC GM position.

63. Although Ms. Keeley was eminently qualified and it was common practice for the company to promote Operations Managers to GMs, Mr. Chavarria said she could not apply.

64. The company ultimately hired a male, Scott Neil, for the GM position who had considerably less relevant experience than either Plaintiff or Ms. Keeley.

65. Mr. Neil was a substandard performer. Among other things, he caused poor employee morale and a corresponding high turnover rate, and was apathetic about employee safety.

66. Upon information and belief and in anticipation of discovery, Office Depot terminated Mr. Neil on or around February 4, 2019 after placing him on a PIP for at least 30 days.

67. Plaintiff filed EEOC charge no. 541-2018-01095 on February 2, 2018 in which she alleged that she had been discriminated against by Office Depot based on her sex.

68. The EEOC issued a Notice of Right to Sue to Plaintiff on April 9, 2019.

# STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended)

69. The foregoing allegations are realleged and incorporated herein by reference.

70. Office Depot subjected Plaintiff to less favorable terms and conditions of her employment based on sex as described in this Complaint, including but not limited to: subjecting Plaintiff to disproportionate scrutiny, including requiring her to participate in calls for underperforming DCs and subjecting her DC to at least three audits within three weeks' time; holding Plaintiff to a higher standard than her male peers; belittling and demeaning Plaintiff in front of others; terminating Plaintiff without basis and in violation of Office Depot's progressive discipline policies and procedures; hiring an underqualified male to replace Plaintiff as GM of the Denver DC; and failing to pay Plaintiff severance and/or any part of her 2017 bonus.

71. Office Depot's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

72. Office Depot's conduct discriminated against Plaintiff based on her sex in violation of 42 U.S.C. § 2000e-2(a) of Title VII.

73. As a direct and proximate result of Office Depot's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Breach of Contract)

74. The foregoing allegations are realleged and incorporated herein by reference.

75. During Plaintiff's employment, Office Depot promulgated policies and procedures related to progressive discipline and termination.

76. According to these policies and procedures, a management/exempt-level employee, like a GM, could not be terminated unless she was first been placed on a PIP. Even then, the employee could not be terminated absent consultation with Office Depot's HR and, at times, Legal Departments.

77. These policies and procedures constituted an offer to Plaintiff.

78. Plaintiff accepted Office Depot's offer by continuing to work for the company.

79. Office Depot breached its contract with Plaintiff when it summarily terminated Plaintiff in violation of Defendant's policies and procedures regarding progressive discipline and termination.

80. As a direct and proximate result of Office Depot's breach, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits and other recoverable expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Annette Nick respectfully requests that this Court enter judgment in her favor and against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B. Back pay and benefits;

11

    C.    Reinstatement or front pay;

    D.    Injunctive and/or declaratory relief;

    E.    Punitive damages;

    F.    Attorney fees and costs of the action, including expert witness fees, as appropriate;

    G.    Pre-judgment and post-judgment interest at the highest lawful rate; and

    H.    Such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted July 8, 2019.

By:    SWEENEY & BECHTOLD, LLC

s/Charlotte Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
5520 Arnie Loop
Lakewood Ranch, FL 34211

**CERTIFICATION OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.

                By:    SWEENEY & BECHTOLD, LLC

s/Charlotte Sweeney
650 S. Cherry St., Ste.700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF